Our next case is Safeworks Illinois Occupational Health Services v. St. Mary's and all. 410-0992 for the appellant, Mr. Velker, for the appellee, Mr. Ellis, and Mr. Kiley. You may proceed. Thank you. Please report, counsel. My name is Dan Velker and I'm here on behalf, along with my co-counsel, Paul Duffy. I'm here on behalf of the plaintiffs, Safeworks Illinois Occupational Health Services Ltd. and David J. Fletcher. I'll refer to Safeworks Illinois Occupational Health Services as Safeworks or Safeworks Illinois. First of all, it's a pleasure to be here and I want to give you a brief factual background of the facts in this case. On about June 30, 2010, Safeworks sold its Decatur unit to St. Mary's Hospital. Along with that sale, there was a commitment on the part of Safeworks to allow St. Mary's to hire its Decatur employees, employees that were employed and had duties solely to the Decatur unit. Along with the sale of the business and the employees, essentially, of that unit was the sale of two mobile medical vans that serviced occupational health care people and employees throughout central Illinois. Shortly after the sale of the assets, St. Mary's Hospital offered employment and hired four employees of Safeworks Illinois. Those four employees were employees of the business unit of Safeworks and had corporate-wide responsibilities. It included Andrew Howe, who was the chief financial officer of Safeworks Illinois. Safeworks Illinois had three offices in the state. One was in Decatur, one was in Champaign, one was in Chicago. So after the sale of the Decatur unit, Safeworks continued to operate its business in Champaign and Chicago and to this day continues to operate that very same business. Safeworks Illinois is in the business of occupational health care, as is St. Mary's now, with the acquisition of the Decatur unit formerly of Safeworks. After a two-day evidentiary hearing and testimony from 11 witnesses, the court, in this case, rendered a decision denying plaintiff's motion for preliminary injunction. As I mentioned, shortly after the sale of the Decatur unit, St. Mary's approached these four employees and offered them employment. If we agree that a preliminary injunction should be denied, what happens? Precisely, what's the next step in this case? The next step would be the case would go forward, Your Honor. And to what extent would the denial of a preliminary injunction affect your ability to go forward and present evidence in support of your claim for, I guess, injunctive relief generally? It would not prevent us from going forward, Your Honor. But by the time that decision, by the time that case was heard, tried, and the decision was rendered, and I suspect an appeal would follow, if it were successful, that two-year period would have clearly run. What two-year period? Well, the two-year restrictive covenant within the contract itself would have run. And the reason why that two-year provision is in the contract is to prevent those employees from, during that period of time, being able to go to work for a competitor and to provide that confidential information that they have learned through the years at SafeWorks. It's not a punishment. A two-year restrictive covenant is not a punishment for employment. It's a protection afforded to the employer, so the information of that type isn't transmitted during that two-year period. In this case, the court found that the motion for an injunction should be denied because what was actually being sought was a mandatory injunction. And the court found that because the court decided that the status quo couldn't possibly be preserved since these employees had, by the time the case was heard, gone to work for St. Mary's. We suggest, Your Honor, that the trial court's decision was erroneous and should be reversed. There was nothing about the injunction that SafeWorks was seeking that was a mandatory injunction. Well, leaving aside that for the moment, you're seeking an injunction. What's the difference between a mandatory injunction and a preliminary injunction? The difference, Your Honor, is the standard for a mandatory injunction is substantially higher. According to the two decisions that the trial court relied upon, it requires, first of all, the first element is a clearly ascertainable right, free from doubt. That's an element that's not required for a preliminary injunction. I thought that's what Mulhanty said was required for a preliminary injunction. A preliminary injunction really requires an ascertainable right which needs protection, not free from doubt. The court actually in its decision specifically quoted those decisions and said- So the difference is a clearly ascertainable right in need of protection as opposed to a clearly ascertainable right in need of protection and free from doubt? That's part of it, Your Honor. But also the decisions relied upon by the trial court stated that mandatory injunctions are disfavored under the law and only permitted where an emergency exists and serious harm would result if the injunction were not issued to preserve the status quo. How is that different from irreparable injury? Irreparable injury, Your Honor, merely implies that the injury is going to cause some damage that can't be undone. That sounds like serious harm. Well, it doesn't necessarily mean there's an emergency. It doesn't mean that there is serious harm of the nature of a mandatory injunction. A mandatory injunction is disfavored under the law because it requires, as I understand it, the court to essentially force someone to engage in an act. One way to distinguish it would be a preliminary injunction would be to stop digging a hole in your front yard. A mandatory injunction would be start digging a hole in your front yard. There's a dramatic difference between those two scenarios. One requires the court's intervention and perhaps requires the court's involvement. But clearly the decisions that the trial judge relied upon impose a much higher standard upon the movement. Are you required to demonstrate a likelihood of success on the merits? Yes, Your Honor, and I think by the judge's decision we did that. He says specifically on the last page of the decision that both parties had presented, quote, unquote, colorable competing positions. Well, but that's not good enough, is it? It is, Your Honor. Well, as a for instance, didn't the court also make reference to the claim that the defendants had made in a colorable position that the plaintiffs had forfeited some of their claims here? There was some evidence showing that they failed to act upon it. I think the court used the term waiver, but I don't think that's accurate. And if there's some evidence of that, at what point is that to be resolved? Well, Your Honor, this court I think found in Sundahl-Reynolds that in order to meet the proof requirement for a criminal injunction, you must show a fair question exists regarding the claim of right. Whether or not there are potential defenses of estoppel and waiver, which go to the issue of a likelihood of success on the merits, that doesn't change the fact that there's a fair question of the claim of right. Those defenses are not presumed to be valid defenses and they will succeed in the case. Well, you're speaking to three members of the appellate court that also had substantial experience as trial judges. And as trial judges, if we were called upon to issue an injunction in circumstances such as this, we would have to be persuaded that you showed a likelihood of success on the merits. Everything that I read and infer from Judge Leonard's comments are, he's totally uncertain whether you're going to succeed on the merits. Well, Your Honor, you applied the wrong standard. You applied a much higher standard, first of all. Well, that's applying the standard of Malianti. I understand he may have, whether we need to go off and discuss whether it's mandatory. Injunctions themselves are extraordinary relief. Let's use the lesser standard. Is there an irreparable injury? Is there a clearly ascertainable right? And is there a likelihood of success on the merits? What does likelihood mean? Does it just mean a whisper of a claim? Or does it mean it's likely you're going to succeed on the merits and that's why I'm going to give you an injunction? That may not be the ultimate result, but it appears likely. This Court of Sunbelt Rentals found, as I recall, that an injunction under these circumstances is customary and proper. And that's exactly how we use precision. I wrote Sunbelt. There was no issue about this. There was no issue about likelihood of success on the merits. What we have in this case is we have valid contracts signed by the parties, supported by consideration, uncontested consideration. Well, wait a second. What about the whole forfeiture business, about the father of your client who supposedly was in negotiations? Didn't he testify at trial in this case? He did testify at trial, Your Honor. And didn't the judge say, gee, you know, based upon that, I'm not so sure that they haven't forfeited this? I don't think he did, Your Honor. He said that both parties presented colorful positions. Well, what did he mean other than that and other than the doctor's testimony, the damages, that he thought there were damages that he could calculate? He did not even address the issue of reasonable likelihood of success on the merits. He said the only element that was missing was a clearly askable right free from doubt, which was the wrong standard. He specifically found that the Court notes that able counsel for the parties had mustered colorful competing positions, alluding not only to the appropriate construction of the non-competition agreements, but also as whether plaintiffs have either waived their application or are stopped from invoking them. This Court found the proof required is a fair question. Clearly, the plaintiff presented a fair question. The fact that there are defenses that have been raised doesn't defeat the fact that there's a fair question. Is it a fair question? Well, when you talk about a fair question, I'm not sure what you mean. Don't you have to demonstrate to the trial court's satisfaction that you're likely to succeed on the merits, meaning that the forfeiture argument they have made is not likely to prevail? Don't you have to demonstrate that? You have to prove that you have a reasonable likelihood of success on the merits. You don't have to disprove their defense. But you don't have success on the merits if their defense prevails, do you? Well, the Court also makes the point, Your Honor, and I think there's another reversible error and misunderstanding of the standard, that the Court doesn't need to make any findings of fact, conclusions of the law, or assess the evidence. He says that that would be inconsistent with the only Supreme Court's decision that a court shouldn't decide the merits of a preliminary injunction. I understand what that means, and I agree with that. But the Court shouldn't be inclined to not make any decision upon the facts whatsoever, but to simply apply the standard of a mandatory injunction and to state that under that standard, the status quo could not possibly be preserved in this case. That's clearly a reversible error. The last peaceable event in this case was clearly the termination by these four employees from SafeWorks. At that point in time, they had every right to terminate their employment with SafeWorks, and that was the last peaceable event in this case. The fact that they went to work for St. Mary's a day later, or two days later, is irrelevant to the point that the Court could have easily granted the injunction and preserved the status quo by simply saying, you cannot go to work at St. Mary's any longer until further order of this Court. That's consistent with Sunbelt Rentals, and there's no decision that we're aware of in the entire state of Illinois where a trial court or an appellate court has ever applied a mandatory injunction standard to the enforcement of a non-compete agreement. Let me see if I understand what you're saying. It's your position that the trial court, because it believed it was dealing with this mandatory injunction, applied the wrong standard, the last peaceable... Uncontested event. Uncontested event. And, but for that, you might have prevailed. Absolutely, Your Honor, because the Court found that it adopted in his decision, he said that there's no colorable argument that the plaintiff's claim is not a request for a mandatory injunction. I suggest to you that it was not a request for a mandatory injunction. He further said, I'm going to recharacterize the defendant's argument, which is the only argument that I'm adopting, he said, in his decision, and that is that there is no way for this Court to preserve the status quo, simply because these four employees left SafeWorks employed, went to SafeWorks so quickly that there was nothing he could do to stop it. Well, that's clearly a reversible error, because no court has ever found that you need to meet the high standard of a mandatory injunction to enforce a non-compete agreement against an employee who has left your employee to go work for a competitor. No court has ever found that. The Court clearly misunderstood the standard, and by misunderstanding the standard, actually citing the Shogin case, and another case, Sykes' case, the Court specifically said that we needed to show a clearly ascertainable right, free from doubt, and I suggest, Your Honors, that that is a standard that is not appropriate or applicable to a plaintiff's motion of preliminary injunction. So is all of this discussed at the trial level? Discussed in what sense, Your Honor? I'm sorry. Was the position of is this a mandatory preliminary injunction talked about before Judge Leonard? Did you make the same argument, Judge Leonard? Absolutely. Judge Leonard did bring this up, I think, during the second day of the hearing. There was a hiatus between day one and day two, as I recall. He did bring this up, and we argued vehemently against it. Notwithstanding that, he adopted the position of the defendant that this was a mandatory injunction. That was their position at that time? That's correct. And, Your Honor, I think you raised the issue of the defenses. It's a good point. You mentioned you were a trial attorney, a trial experience attorney. I understand that. If the Court is judging those defenses, estoppel and waiver, on a standard of free from doubt, clearly ascertainable right, free from doubt, I understand why he might have said, oh, well, I can't say it's free from doubt, because what's free from doubt anyway? This panel, as I understand it, has found that all you need to show in a preliminary injunction is a preponderance of the evidence. He essentially applied a criminal standard to a civil case. And we'll never know exactly what was in his head, but we know what his decision says, Your Honor. And it categorically, 100 percent, says he applied a mandatory injunction standard. There's no question about that. It says that he could not preserve the status quo as a matter of law. And it says that both parties have presented colorable claims. And I suggest, Your Honor, that a colorable claim is enough of a burden to meet the requirements of a preliminary injunction, and that to require more than that would not be fair, especially given the judge's comments he saw in his decision that, you know, the parties got off on a frolicking detour occasionally, which I don't agree with. Say again? Well, the Court in his decision mentioned that the parties from time to time had lapses and went beyond perhaps what was necessary for the preliminary injunction. Well, I don't agree with that. But my point is that a lot of evidence was presented, and the Court did find that we had a colorable claim. A colorable claim has to mean, Your Honor, that there is a potentially reasonably enforceable agreement between the parties supported by consideration that has a reasonable and acceptable geographic restriction and temporal restriction. And given that, the Court should have enforced the agreement, as the courts throughout the State of Illinois do routinely. Well, let me ask this. As opposed to putting words in your mouth, what relief are you seeking from this Court? Your Honor, I'm glad you asked that question, because given the fact that the Court has said that there is a colorable claim presented by the plaintiff, given the fact that he applied the wrong standard, the wrong element, and the only element he addresses in his decision that he says so much is the clearly ascertainable element, element number one, I would ask, Your Honor, based upon his decision, his findings in the decision, not to just remand this case to the Court for further direction, further proceedings, but to actually enter the injunction that SafeWorks has requested. This Court, in its decision, in applying the wrong standard, has made the findings that are required for the entry, excuse me, of a preliminary injunction. Well, why should we, if we agree with you that the Court improperly viewed this as a mandatory preliminary injunction because of the business of the last peaceable status quo, why shouldn't we send this back to the trial court with that direction and say, look, this is not that case. This is a preliminary injunction and apply the Mohanty standards, and you heard two days' worth of testimony. Apply that, and then tell us what you find. That's an option, Your Honor. We would ask that at a minimum that would be what we would ask this Court to do. But I would suggest to Your Honor, this Court, that the findings that the judge has made already support, conclusively support the entry of a preliminary injunction. By finding the only element that wasn't met as the first element, the clearly ascertainable right free from doubt element, which really doesn't go to the success and the merits issue anyway, Your Honor. It really goes to the issue of whether or not the party has standing, whether there is an agreement that it is a party to, to which it is entitled to enforce. So the Court only addressed the lack of evidence on the first standard and said that's the only element he finds lacking, as I understand his decision. And I think that given the fact that on page 6 or 5, he said specifically that both parties have mustered colorful competing positions relating not only to the appropriate construction of the non-competition agreements, but also related to whether plaintiffs have either waived their claim. I think that he's said specifically that there's enough evidence in the record to meet the standard of presenting a fair question. And I think, therefore, it would be essentially a waste of resources, I guess, and, Your Honor, to send it back down injures the plaintiff dramatically because the passage of time, it doesn't do plaintiff any good. It deprives him of what he essentially needs to do. What about the argument that equitable remedy isn't required in this case because, assuming you prevail, there is a basis to determine what damages the plaintiff has suffered? There is a basis? Yes. That's a red herring, essentially. The question was asked to Dr. Pletcher at the trial was whether or not he would, at trial in this case, be able to present a damage report or opinion and seek to recover monetary damages. And he said yes. Of course he did. Did he say, Your Honor, that would make him whole? No. I'm not sure I understand. If someone says, yes, I can calculate damages, why isn't that sufficient to rebut the need for equitable remedy? Good question, Your Honor, because to defeat the adequate remedy law element, you have to show that the monetary damages will make you whole and make you 100% compensated for the loss. During the hearing, there was a lot of testimony from Dr. Pletcher and others about the irreparable harm that had occurred and was occurring by virtue of the hiring of these employees. These employees had been and were indisputably providing confidential, protected, trade secret type information, competitive strategies, marketing strategies to the hospital. That can't be quantified, Your Honor, as a matter of law. But I don't understand the answer. I wasn't the witness. Dr. Pletcher testified. He answered yes. If all of this is true, why didn't he say, no, we can't do that? He didn't answer yes that he would be made whole. That's the difference, Your Honor. The Supreme Court has said that. I don't understand that as a difference. It seems to me that that's what lawyers talk about. But when you ask a guy, you know, gee, you know, these people did something bad to you.  Yes. He had a nine-count complaint, Your Honor, and there is a request for monetary relief, and I believe he's correct that to the extent that you can calculate a portion of that relief, he'll be able to do it, and he'll do a good job through an expert otherwise doing it. He did not testify. I'm sorry I'm running out of time. He did not testify that he'd be able to recover a monetary relief such as to make him whole. That question was not asked of him. He didn't answer the question that way. Thank you, counsel. I don't have time. Are you both speaking? Yes, Your Honor. Have you split your time? Yes, Your Honor. Good morning, Your Honors. My name is Chris Ellis. I'm an attorney here on behalf of St. Mary's Hospital. As often happens, my outline has now been thrown out the window after hearing the questioning from the court. I think that the statement made earlier that when you view the record as a whole and you look at the court orders, the only opinion that can be reached is that the trial court below found that there was no reasonable likelihood of success on the merits. Did you argue to the trial court that the last peaceable, unconsistent status was one in which the employees are now working for St. Mary's? Your Honor, the hospital did not make that argument. That argument was made by the defendant employees. That's wrong, isn't it? As a matter of law? Your Honor, I believe the last peaceable, actual time to preserve the status quo was prior to the time the contracts were executed. I don't understand what you just said. When this agreement was signed, what happened at that point is that there was a practice operations agreement where these specific employees began working for the hospital and were, in fact, paid by the hospital as part of this operation agreement. Does that mean you're adopting the argument the employees made? I believe the argument that the employees made is that the last peaceable time was after the contracts were signed when they were working for St. Mary's and for SafeWorks. And whether I'm adopting that argument or I'm not refuting it, again, I believe the question here is whether there's any basis in the record to affirm the trial. Well, no, I'm concerned if the trial court was... As my colleague Justice Connexon, we're former trial judges. We got three, maybe four decades worth of experience in the trial of this particular panel. And I'm concerned when the trial judge has been sold a bill of goods and may have been led astray. It seems to me that the plaintiffs have a pretty strong argument here that the last peaceable uncontested status was not when the employees were working for St. Mary's, but it was when they were working for nobody. And I'm wondering if that is correct as a matter of law, to what extent that, like a better way, tainted or, better way, put it, tainted or poisoned the trial court's assessment of what this case is all about. Yes, Your Honor, if I can answer that in two different ways. Go ahead. In the first part about whether the trial court had been tainted by argument, it was Judge Leonard who raised the Chodine opinion and, in fact, instructed counsel during argument, I believe, in the record, about how he viewed the last peaceable actual status quo time period. So I don't think it was counsel... So it's a self-inflicted wound by the trial court. If I can carefully say such things, I would probably go that route. Okay. Two, as for a period of time when these employees were not employed, there is no such period. The testimony in the record was that the transition from the hospital to... from SafeWorks to the hospital was instantaneous. It was simultaneous. It happened instantly. So, again, because of the nature of this dispute, I've yet to find a case where a party that sold a business and did not disclose non-competes is then seeking to enforce those non-competes. So these employees, in fact, went to work on the hospital's campus... By the way, that's an interesting point. The business about not disclosing the non-competes might be of interest to the hospital, but the employees knew because they signed it. So why does... You know, when you talk about, gee, it wasn't disclosed, how does that matter as far as the employees are concerned? From a procedural point, it matters because the relief sought by the plaintiffs in the preliminary injunction motion is that St. Mary's terminate these employees. Okay. The relief sought in the motion itself is not seeking that these employees terminate their employees. So, and they sought that the employees walk away from those jobs. You wouldn't be here. I think it would be a better argument, but I think the court still would have found how it found after two days of evidence. So basically, the hospital is not a party to the contract. So St. Mary's said we didn't know about this non-compete and we shouldn't be forced to honor it and fire these people, but if you want to force them to leave us, that's different? No, Your Honor. I would not say it's different because there are other arguments about what... Well, in fact, they did that. I mean, there's no question the employees knew because they signed it. Isn't that right? The employees did sign the agreement. Okay. So presumably they knew the documents they signed. Okay. But as from the hospital's standpoint, again, when you look at this transaction as a whole, these contracts were not disclosed. The amount... At some point when the hospital says, gee, you know, why are these people, Andrea or Don or whoever all those folks are, you know, we think we might want to hire you. Isn't there kind of an obligation of these people to say, well, you know, that would be a good idea, but we've got this contract we signed that contained these non-compete agreements. Doesn't this discussion have to occur at some point? The majority of these employees are high school educated clerks in a billing department, and I think the testimony... You know, I'm just signing stuff like in my insurance policy with a state firm. I have no idea what's in it. Reading the record as a whole, Your Honor, I think that's a fair reading of the testimony. But beyond that, as to the issue of waiver and asylum, that has been pled by the hospital as one, and again, I think there are at least seven grounds why this court can affirm the trial court. As outlined in our brief, the question is whether there's any basis, if the court got the decision right, it should be sustained. Now, the conversation about mandatory injunction versus preliminary injunction, I think moves us a bit beyond the point of what this court can do with its review. If the court on the record as a whole determines that the plaintiffs have failed to meet their burden under Mohansky, then this court can affirm the trial court. And the trial court...  Thank you. The issue, however, is how do we read what the trial court did here? That is, under Mohansky, the plaintiff has to have a clearly ascertainable right in need of protection. The mandatory preliminary injunction seems to require more, does it not? Your Honor, actually, if you read the Shodin opinion itself, the Shodin opinion cites the standard for a preliminary injunction. And then what the trial court cited in this order is the language from Shodin that basically says... And Shodin also cites the standard for a preliminary injunction. The Shodin court said that a preliminary mandatory injunction is an extraordinary remedy, not a matter of rights, and the court may grant such relief only when the necessity for such relief is clearly established and free from doubt. So I read that to be the same thing as that an irreparable injury will occur to the plaintiff. That there is a serious need, serious harm will occur. What about the trial court's mention that mandatory preliminary injunctions are disfavored in the law? The court said that at least once, I think maybe a couple times, did it not? It does, Your Honor. Okay, that's not true with regard to the preliminary injunctions discussed in Mohanty, is it? I would disagree in that. Did Mohanty say it was disfavored? I don't believe it used those exact terms, Your Honor. Well, what terms did it use that were even close? I'm speaking not about Mohanty and the words it used, but just in general how restrictive covenants are construed very carefully and they are generally disfavored under the law in general. When was that said with regard to, for instance, these lots of cases dealing with preliminary injunctions to enforce restrictive covenants? Mohanty didn't talk about that. That was a case where it doesn't get any worse factually. We're dealing with a physician and patients who are cut off and all that. Did the Supreme Court forget to mention that these were disfavored? No, Your Honor. I don't believe the Supreme Court forgot to mention that. See, here's my concern. Yes, Your Honor. The trial court emphasized these were disfavored. This proceeding is disfavored and there's this heavy burden. If this is not correct as a matter of law, should we send it back to the trial court and say, you know, you are using a standard here to apply to the evidence you heard that really isn't correct and go back and apply the law without this disfavored language, number one, and without the language about free from doubt? It should be a clearly ascertainable right, but not free from doubt kind of sounds like the unreasonable doubt, as counsel argued, the criminal standard. Why shouldn't we do that if we think that the court applied the wrong standard? Your Honor, I don't believe you're required to do that. No, I'm not sure we're required, but we're not sure how the court viewed all of this. If it had not applied their incorrect standard, why shouldn't we send it back? Your Honor, I believe that is an option that you can do, but again, I believe that the case law that's cited in our brief counsels that, again, even if a court does apply wrong reasoning, which I'm not stating here the trial court below did, but even if it did, if this court reviewing the record as a whole believes that the trial court having the advantage of hearing two days of testimony, hearing evidence about the equitable arguments by both sides, looking at the transaction as a whole, refused the preliminary injunction, and the basis for that is in the record, it's not an illogical conclusion, then this court may affirm on that basis. So the question of mandatory injunction versus preliminary injunction, I acknowledge my life would be easier today had the language been different, but I think when you look at what the plaintiffs were asking the court to do, it was asking St. Mary's, a non-party to a contract, to terminate employees who was working for them based on a tortious interference claim when there were a number of defenses that St. Mary's had asserted to those claims, including waiver and estoppel, whether the contracts themselves had been assigned to the hospital. So hearing all this together, the trial court found and suggested to the parties in counsel that he viewed this as a mandatory injunction, one where the status quo ante cannot be returned, one point possibly, because SafeWorks no longer has a place of business in Macon County and can no longer work in Macon County. There is no place for these employees to return to. The plaintiff wants to make them go work in Champaign, Illinois, and make them drive that distance. So there is no status quo ante because there is no physical location where they were where they can go back to work. So that's just one reason. It's not articulated that way, but when you review it as a whole, that's one of the bases, along with a laundry list of others I had that I didn't get to, which I believe we could use, this court could use to affirm. So with that, I would ask that the court affirm the trial court's ruling, or if not, that it be remanded to the trial court with the directions discussed by Your Honor. I cede the rest of my time to Mr. Kiley. Good morning. Thank you for your support, counsel. I'd like to clarify just a couple of things. First of all, my name is Jack Kiley, and I represent the employees in this matter, former employees of SafeWorks. To respond to something you had mentioned earlier, Justice, we did not assert that this was a mandatory injunction. That was something, as counsel pointed out. The court raised a response there? Exactly. What we did say, and this is important, was that the status quo couldn't be restored. And the reason that's important is because that applies whether or not it's a mandatory injunction or an ordinary preliminary injunction. So if this court finds that the court was correct, that the status quo cannot be restored, then that is a basis. Well, the phrase, the technical legal term, is the last peaceable uncontested status. And that seems to be when they weren't working for anybody. Your Honor, as I understand it, and the Postma case, which is an Illinois Supreme Court case, it's the last actual peaceable uncontested status. And isn't that when they weren't working for anybody? Well, as Mr. Ellis points out, there really wasn't a point in time. Well, it had to be some point in time. They didn't, you know, I mean, overnight between one job and the other. I would agree with that. And as plaintiffs point out, metaphysically, there certainly wasn't a point in time. But we find ourselves in a very unique position here, where the plaintiffs consented to them working for their competitor during this transition period. And so there was a period of time that was uncontested, that was actual, that they were working for both entities with the cooperation and the permission of the plaintiffs. And during that time, despite what they claimed the purpose of these non-competes were, they were expected to enhance the clientele relations of St. Mary's. So you had these valuable employees working for SafeWorks that have now been told to go work for St. Mary's, and to build customer relations, enhance the business, and things like that. So that fact, it cannot be overlooked in this case. And I think that was something that we certainly harped upon over the two days with the trial court. It's something that would certainly distinguish this case from others that have been cited by the plaintiffs. And as I say, the purpose of a preliminary injunction, whether it be mandatory or not, is to preserve the status quo. And so, unless the court was... Well, let me stop you there. The difference between a preliminary injunction and a mandatory injunction seems to be pretty significant here. And you heard Mr. Velker's argument about how, and the trial court seemed to say this, these are disfavored. And the burden of proof is very high. It's not just, yes, a pertainable right in need of protection, but it must be freed from doubt. These are two aspects that don't apply to preliminary injunctions, do they? Well, I think the status quo still applies to preliminary injunctions. Well, the two questions I just mentioned, one being disfavored and the second being free from doubt, do not apply. I would agree with that. Okay. So my problem is I understand how we can affirm the trial court on the basis shown by the record. But when the court is essentially viewing all of this and making these determinations, how do I know, what the trial court may have said, if it were relieved from the burden, if we think that this was an incorrect assessment, of the disfavored status and this very high burden of proof? I suppose the only way I can respond to that is by saying that the burden or the analysis for determining the status quo wouldn't have been different whether or not the court employed a mandatory injunction standard. And he found that the status quo couldn't be restored. And that analysis is the same, whether it's an ordinary preliminary injunction or a mandatory injunction. And here he found that the status quo could not be restored. And so whether or not he then goes to the next step of applying the free from doubt analysis and things like that. Well, I'm not sure. Go back and explain that one again. When you're talking about the last peaceful, uncontested status, why, that assumes that these employees couldn't go back to work for the plaintiff. And I'm not sure how, why that couldn't have happened. Now you say, well, they'd have to be in Champaign instead of in Decatur. Well, I have a law clerk who commutes from Springfield to my office in Urbana. I'm not sure, you know, this isn't, you know, this is the kind of a commute that most people in Chicago would laugh at. It's not exactly the Dan Ryan expressway. So what's the big deal? Well, that was something that Judge Leonard had the benefit of hearing. Ellen Dorn, for example, is a Canadian citizen. She was working part-time in Decatur. It was her understanding that when she was to be moved over to Champaign, she'd be working even less. When she had to go to Champaign on occasion, she would be given mileage checks and things like that because it wasn't a commute. So now she's working less, getting paid the same amount, and having to pay to drive 50 miles one way every single morning. Her husband lives in St. Louis, and the only times they would see each other was on the weekends. And so it really was a crippling thing, the notion that she would have to go do that. Those are the sort of things that we're talking about. Speaking of irreparable harm, Ellen Dorn was replaced a day or two after she resigned or left SafeWorks by a more qualified candidate. So these were not high-level employees that would conceivably pick up and leave their homes. Well, she was replaced by a better qualified candidate. Why are they here trying to sue her to keep her from working for her? That's an exceptional question, Your Honor. We don't know. Just spiked? Well, that's a theory. And I think it's a theory that could be argued pretty strongly. They were not initially named as defendants. Ellen Dorn, Don Austin, and David Johnson were not initially named as parties here. Judge Leonard ordered them to be named as parties because their rights were being adjudicated under the contracts. There was some discussion also about whether or not the hospital was told about the non-compete clause. But the employees knew. So isn't there some obligation on their part to tell prospective employers like St. Mary's Hospital, yeah, I appreciate your offer, but, you know, I got this clause I signed and maybe that's something we have to address? The testimony received during, I think, day two of the hearing was that Archie Fletcher, who was the secretary for SafeWorks who did all the negotiating for this transaction, had told Andrea Howe that he would never stand in her way if she wanted to better herself and find a new job. So that was interpreted by her as giving her permission to do whatever she wanted to do. So that's the father of the doctor. That's correct, Your Honor. And the other testimony received was that they just didn't remember signing it. And to the comment made earlier about signing insurance papers, this was something in a packet. The first day at work, they signed their life away in several ways it sounds like now. But that was the situation. And, again, Andrea Howe, who I would even consent or concede that is the most important employee of these four, is a high school-educated woman who received her training from Archie Fletcher for the most part. Your time has expired. Do you have anything further that you feel that you need to add? I don't. Thank you. Thank you. Rebuttal? I want to clarify a couple of factual issues. First of all, there was no question at the hearing that St. Mary's was aware, before it actually hired these four individuals, that they had non-competes. The evidence is undisputed that Dr. Fletcher had a meeting with Glenn Grisham and others and told them about the existence of the document. What about the comment that we just heard? I was reminded of it in the record about Archie Fletcher saying, yeah, I'd like to stand in your way. The evidence at the trial was that Andrea Howe, who drafted the non-compete agreements and countersigned several of them, lied to him and told him there were no non-compete agreements. In fact, she presented a document to the hospital where she simply said that there were no non-compete agreements. So he was misled by her. He had come into the business fairly recently. So he testified he was misled by her. She lied to him about the existence of those agreements. So I won't stand in your way was in the context of not knowing? Not knowing, Your Honor, indisputably not knowing the existence of the non-compete agreements. Was she asked about lying to him? She was asked. She said she did not tell him about the existence of those agreements. She had forgotten, didn't think it was relevant, something along those lines. But one other point I wanted to clarify is that these four individuals, Your Honors, never did not work for St. Mary's Hospital until August 17, 2010. Counsel's incorrect. Under the practice operations agreement, they remained employed by SafeWorks but were providing some portion of their time as transitional services to the hospital for the hospital's benefit. They were not working for St. Mary's. That's patently false. Also, I think the whole idea of how long of a period of time between the time that they terminated from SafeWorks, which they clearly did, and when they went to work for St. Mary's is completely and utterly and all due respect irrelevant because if someone could sidestep a non-compete agreement by simply hiring someone while they were still employed by a competitor, that would turn the whole law of non-competes on its head. Clearly, the last peaceable, uncontested event in this case is that moment upon which those employees were no longer employed by SafeWorks, regardless of who else had jumped to employ them. In our view, that's clear. Was there a period of time where rather than serving two masters, because your position would be they worked for SafeWorks, they were nonetheless, as part of this transition, supposed to be doing good things for St. Mary's? There was a period of time, it would be June 30, 2010 through August 17, 2010, when the business unit of SafeWorks Illinois that serviced the entire entity was supposed to devote some portion of their time, some precise amount of their time, to bill for the entire unit, which would have included billing for the services provided by the decanter unit. It was simply a transitional offering to the hospital to ensure that it was a profitable engagement on their part. The evidence was clear that it wasn't until August 17 that Glenn Grisham said that he had extended offers of employment to these individuals. They left SafeWorks and terminated their employment at SafeWorks no later than August 16. So, as in Sunbelt Rentals, it was a very, very short period of time between the date these individuals terminated and the date they were employed by the hospital. Again, Andrea Howe finally drafted these agreements. She was also the head of human resources at SafeWorks Illinois. She drafted the agreements. She countersigned several of the agreements. And she never told the hospital about the existence of the agreements. There's no, as did none of the other employees, ever tell the hospital about the agreements. But they clearly knew when they offered, extended the offer of employment. And by doing that, there certainly isn't any sympathy to be accorded to them because those agreements, in our view, are clearly enforceable on their face, supported by consideration, and they're reasonable both in geographic scope and temporally. But it's also not, apparently they didn't know when they made the purchase. They did not know when they made the purchase, that's correct. But they found out before they made the offer. Before they made the offer. Before these individuals actually accepted and became employees of the hospital. There's no question about that. During a six-week period, the transition that we've talked about, the billing that they were doing, and the activities they were engaged in, if I'm thinking in terms of, you made reference to confidential information and or business practices that were perhaps unique to SafeWorks, wouldn't they have been engaged in doing that during the transition period? No, no. In fact, the evidence was that Andrea Howe was secretly providing information regarding how St. Mary's could actually compete in the marketplace and could go out and find existing customers and new customers and extend their arrangement by virtue of some of the software that SafeWorks had developed over the years and paid for, and was doing all this behind the back of both Archie Fletcher and David Fletcher. And she was doing that during the six-week period? Right. She was never employed. She was simply there. She was simply in the same location she'd always been in, for the entire corporate entity. She was not identified on Schedule 6J to the asset purchase agreement as someone who would go with the Decatur unit, precisely because the intent was to maintain the business unit of SafeWorks. Otherwise, SafeWorks would essentially be out without its entire business corporate unit after the transaction and the sale of the Decatur practice, which would leave it, and did leave it, completely unable to conduct its business for a lengthy period of time, which it's still struggling today. Just one final thing, Your Honor. Could I have a little more time? I wanted to say that, in our view, it would be unfair for the trial court essentially to render a decision where I think he applied the wrong standards, and then to ask this court essentially to scour the record and make factual findings de novo as to why this injunction, nevertheless, should have been denied. Because this court, in all due respect, wouldn't have the benefit of listening to the witnesses testify and really hearing how the documents were, what role they played in this case, and really acting as a trial judge at the appellate level. So we would ask, Your Honors, to remand this case at a minimum to the trial court with direction to apply the appropriate standard. And then the alternative, Your Honor, I would ask you to consider carefully, based upon the language of the order, simply granting the injunction. Thank you very much. We'll take the matter under revising.